In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-20-00228-CV**
_____

**ISRAEL BOB, Appellant**

**V.**

**BAPTIST HOSPITAL OF SOUTHEAST TEXAS, Appellee**

_____

**On Appeal from the 172nd District Court**
**Jefferson County, Texas**
**Trial Cause No. E-199,607**
_____

**MEMORANDUM OPINION**

Appellant Israel Bob complains that the trial court erred in granting summary judgment to appellee Baptist Hospital of Southeast Texas ("Baptist") on his medical malpractice action. We affirm the trial court's judgment.

BACKGROUND

Bob brought a medical malpractice action against Baptist for negligence and gross negligence alleging, among other things, that he was severely burned while under the care of Baptist and its staff, doctors, and nurses due to a scalding hot cup

1

of coffee being placed on a table over his bed.[1] Bob alleged that he suffered third-degree burns when he knocked the coffee onto himself and that his burns went untreated and undiagnosed. Bob further alleged that Baptist was liable for its staff, employees, and agents who provided negligent treatment, care, and supervision, and Baptist failed to safeguard Bob from dangers, comply with accepted standards of care, and exercise reasonable care in the selection and supervision of employees and others who breached the standard of care.

Bob served Baptist with the expert report and curriculum vitae of Dr. Lige B. Rushing, who opined that Baptist breached the accepted standard of care while providing care and treatment to Bob by failing to: (1) discover Bob's burns in a timely manner, (2) document Bob's burns appropriately, (3) notify Bob's physician and family of his burns, (4) institute any treatment for Bob's burns, and (5) supervise Bob's activity of daily living in an appropriate manner. *See* Tex. Civ. Prac. & Rem. Code Ann. § 74.351(a). Bob also included the expert report and curriculum vitae of Lucilla Yeung, RN, MSN, GNP, WCC, who opined that Bob's medical records, which indicated Bob had blisters on his abdominal and left hip area, did not reveal that Bob's coffee burn incident was assessed, evaluated, investigated, or reported to the physician. Yeung opined that although Bob's Post Hospital Follow-Up

---

[1]In Plaintiff's First Amended Petition, Bob also alleged that Baptist was negligent by failing to treat and diagnose his gangrenous leg wound which resulted in his leg being amputated, but this appeal does not involve that alleged injury.

Instructions included applying Silvadene 1% to his burns, Baptist did not provide Bob any treatment for his burns while Bob was a patient at Baptist. Yeung further opined that Baptist's nursing staff was negligent in failing to monitor Bob and serving him hot coffee when they knew or should have known that Bob had a condition that limited his activities of daily living. According to Yeung, Baptist's nursing staff breached the standards of care by failing to (1) provide a safe patient care environment free from unintended incidents; (2) adequately assess and evaluate Bob's condition after the coffee incident; (3) report the incident to the physician, which delayed medical treatment; (4) recognize the significance of Bob's skin condition; (5) investigate the incident and prevent similar injuries; (6) supervise Bob when serving coffee due to his generalized weakness and need for assistance; and (7) inform Bob and his family about the outcomes of care. Yeung opined that these failures to meet the standard of care resulted in Bob's injury of skin trauma.

Baptist filed a Motion to Exclude Plaintiff's Expert, arguing, among other things, that Rushing was not qualified to speak to the standard of care applicable to nurses or to the hospital food service or its staff. Baptist objected to Rushing's causation opinions because he had no factual basis to opine that a hospital employee acting in the course and scope of employment gave Bob the coffee or that a hospital employee was even aware that Bob was given coffee. Baptist also filed a Traditional and No-Evidence Motion for Summary Judgment, alleging, among other things, that

3

Bob's sole causation expert opined that no action or inaction by Baptist's employees caused or worsened Bob's burn injury; Bob produced no evidence Baptist's nurses or staff while acting in the scope of their employment caused Bob to spill coffee on himself or breached the standard of care in serving coffee that was too hot; and Bob produced no evidence of gross negligence on the part of Baptist.

Baptist argued that there is no evidence to support Bob's allegation that Baptist's staff and nurses breached the standard of care by failing to properly treat his burns after the injury occurred, because Rushing opined that the burns healed within a matter of days or weeks and Bob did not develop an infection. Baptist also argued that since both Rushing and Gregory R. Ford, R.N., opined that Bob sustained second-degree burns, and there is no evidence that Bob suffered third-degree burns. Baptist further argued there is no evidence that its nurses or staff provided the coffee that caused Bob's burn injury or knew that someone had given Bob coffee, and Bob testified that he spilled the coffee on himself. According to Baptist, there is no evidence that the temperature of the coffee exceeded recommended guidelines. Baptist's summary-judgment evidence includes, among other documents, Baptist's Nursing Notes, Bob's deposition, Rushing's Expert Report, Rushing's deposition, and the Expert Report of Ford.

Bob filed a Response to Baptist's Traditional and No-Evidence Motion for Summary Judgment and argued that he had presented more than a scintilla of

4

evidence that (1) Baptist and/or its employees acting in the course and scope of their employment caused Bob to spill coffee on himself, and (2) Baptist breached the standard of care in placing hot coffee on Bob's bedside table. Bob's summary judgment evidence includes, the deposition of Nurse Deborah Cutrer, Rushing's deposition, the affidavit of Leslie Mouton, Bob's deposition, the affidavit of Rushing, and Rushing's Expert Report. Bob argued that the evidence showed that even though Baptist and its employees knew not to serve Bob hot coffee unassisted and unsupervised, an employee or staff member left hot coffee on Bob's bedside table sometime after 6:30 a.m. while Bob was sleeping. Bob argued that the evidence showed that the cup found next to his bed was the same type of cup used by Baptist's employees when they deliver breakfast to patient rooms. According to Bob, the evidence shows that Bob does not drink coffee, and there is no evidence that a member of Bob's family placed the coffee on Bob's bedside table.

Bob further argued that based on Cutrer's deposition, it was foreseeable that leaving a cup of coffee next to Bob would cause injury, and Baptist breached the standard of care by serving Bob hot coffee, placing hot coffee on Bob's bedside table while he was sleeping, failing to discover Bob's burns in a timely manner, failing to document Bob's burns and notify his physician and family of his burns, and failing to supervise Bob's activity of daily living. According to Bob, he did not have to provide direct evidence that an employee placed hot coffee on his bedside table

5

because cause in fact may be established by circumstantial evidence and inferences therefrom as well as expert testimony. Bob contends that the circumstantial evidence shows that (1) no family member or visitor placed the coffee on the table; (2) a hospital employee usually comes into a patient's room around 6:30 a.m. to deliver breakfast and offer coffee; and (3) a tray provided by Baptist was next to Bob's bed the morning of the spill. Bob also argued that there is evidence that Bob's burn injury was worsened by the action or inaction of Baptist and its employees. According to Bob, the evidence shows that Baptist and its employees and/or staff members breached the standard of care by not discovering his burn until about twelve hours after the spill occurred.

Baptist filed a Reply to Bob's Response, arguing that Bob had put forth no evidence establishing that any hospital employee brought Bob coffee. According to Baptist, the record shows that the coffee spill occurred early in the morning, and Bob testified that he was sleeping when someone placed a black plastic cup containing coffee next to his bed. Baptist argued that Cutrer was Bob's night shift nurse, and Cutrer testified that on the day the spill occurred, she would have performed her shift assessment around 8:22 p.m. According to Baptist, Cutrer testified that she found a white and green Styrofoam cup sitting up on Bob's bedside table, the cup contained some "dark dry material[,]" she did not know who brought Bob coffee that morning, and morning coffee is served in green mugs and not cups. Baptist argued that there

6

is nothing to suggest that the cup Cutrer saw was the same cup that contained the alleged coffee, and there is no evidence, direct or circumstantial, that any hospital employee or nurse caused Bob to spill coffee on himself.

Baptist further argued that Rushing's affidavit, in which Rushing averred that Baptist failed to institute any treatment for Bob's burns and that failure proximately caused Bob's injuries was made in bad faith, because Rushing testified in his deposition that Silvadene was prescribed the day after the blisters appeared, Silvadene was an appropriate treatment for open blisters from hot liquid, and any alleged delay in discovering or treating the injuries did not cause any harm. According to Baptist, despite testifying that coffee served within recommended temperatures can be sufficient to raise blisters on skin, Rushing stated in his affidavit that Baptist breached the standard of care by failing to ensure that coffee was not served at a "scalding" temperature.

The trial court granted Baptist's Traditional and No-Evidence Motion for Summary Judgment and entered a Final Judgment dismissing Bob's causes of action against Baptist. Bob appealed.

ANALYSIS

In three issues, Bob argues that the trial court erred in granting summary judgment in favor of Baptist, because (1) Baptist and/or its staff delivered unrequested, hot coffee to Bob while he was sleeping and it burned him; (2) Baptist

7

breached the standard of care in delivering hot coffee to Bob and placing it astride his lap table while he was sleeping; and (3) Bob's burn injury was worsened by the action or inaction of Baptist and/or its employees. Baptist argues that this Court should sustain the trial court's Final Judgment because there is no evidence that any employee of Baptist placed a cup of coffee on Bob's bedside table or served Bob "scalding" or hot coffee. Baptist further argues that there is no evidence that any delay in diagnosis or treatment worsened the initial injury or caused additional injury.

We review summary judgment orders *de novo*. *Provident Life & Accident Ins. Co. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). In resolving Bob's issues, we must consider the ruling on the no-evidence part of Baptist's hybrid motion for summary judgment before considering the ruling on the traditional portion of Baptist's motion. *See Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). In reviewing a no-evidence motion, we must view the evidence in the light most favorable to the non-movant. *Id.* at 601. The Texas Supreme Court has explained that the trial court must grant a no-evidence motion if (1) there is a complete absence of evidence of a vital fact, (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence conclusively established the opposite of the vital fact. *King Ranch, Inc. v. Chapman*, 118 S.W.3d

8

742, 751 (Tex. 2003). Because a trial court's decision granting a no-evidence motion for summary judgment is essentially a pretrial directed verdict, the same legal sufficiency standard is used in reviewing rulings made by trial courts on motions for directed verdicts. *Id.* at 750-51. "A genuine issue of material fact exists if more than a scintilla of evidence establishing the existence of the challenged element is produced." *Ridgway*, 135 S.W.3d at 600. "When the evidence offered to prove a vital fact is so weak as to do no more than create a mere surmise or suspicion of its existence, the evidence is no more than a scintilla and, in legal effect, is no evidence. *Kindred v. Con/Chem, Inc.*, 650 S.W.2d 61, 63 (Tex. 1983).

We first address whether there is more than a scintilla of evidence that Baptist and/or its staff caused the spill that resulted in Bob's burn injury by breaching the standard of care and delivering hot coffee to Bob and placing it astride his lap table while he was sleeping. *See* Tex. R. Civ. P. 166a(i). To recover, Bob must show: (1) a duty by the health care provider to act according to a certain standard; (2) a breach of the applicable standard of care; (3) an injury; and (4) a sufficient causal connection between the breach of the standard of care and the injury. *Benish v. Grotti*, 281 S.W.3d 184, 191 (Tex. App.—Fort Worth 2009, pet. denied). Baptist's no-evidence motion for summary judgment contends that there was no evidence Baptist's nurses or staff, while acting in the scope of their employment, breached the standard of care by placing a cup of coffee on Bob's bedside table or by serving Bob

9

coffee that was too hot. Bob was required to produce more than a scintilla of evidence demonstrating that Baptist and/or its staff delivered the hot coffee to Bob. *See Chapman*, 118 S.W.3d at 750-51.

To recover under the Medical Liability Act, the defendant health care provider's "act or omission complained of must proximately cause the injury to the claimant." *Tex. West Oaks Hosp., L.P. v. Williams*, 371 S.W.3d 171, 180 (Tex. 2012); *see also* Tex. Civ. Prac. & Rem. Code. Ann. § 74.001(a)(13). Proximate causation is an essential element of a claim alleging medical negligence and requires, to a reasonable degree of medical probability, that (1) the act or omission was a cause in fact of the injury and (2) the injury was foreseeable. *Windrum v. Kareh*, 581 S.W.3d 761, 777-79 (Tex. 2019).

On appeal, Bob contends that Mouton's affidavit and Cutrer's deposition testimony indicate that Baptist and its employees and/or staff placed the hot coffee on Bob's bedside table. In her affidavit, Mouton averred that she has personal knowledge of the visitors and activities during the time up to and including the spill. Mouton stated that she never placed coffee on Bob's bedside table, and to her knowledge, none of Bob's visitors brought coffee into Bob's hospital room or placed coffee on Bob's table.

Cutrer testified in her deposition that when she first saw Bob on August 7, 2015, he had generalized weakness and needed assistance with turning and

10

repositioning, and the nurse assistants were to assist Bob with his activities of daily living, such as bathing, personal care, and fire precautions. Cutrer testified that she works the night shift, and the night of August 9, 2015, she assessed Bob around 7:00 p.m. Bob did not report any injuries, but she observed bruises and blisters on his abdomen, and Cutrer knew Bob did not have any bruising when she got off earlier that morning. Cutrer testified that Bob told her that "'[s]omebody put some coffee on my over-bed table . . . [a]nd when I woke up, I didn't know it was there, and I knocked it off on my . . . belly.'" Cutrer explained that Bob told her that the spill occurred that morning and that he was upset because he had to call two times before he got his gown changed, and when Cutrer assessed Bob his gown was clean. Cutrer testified that she never brought Bob coffee, and Cutrer did not know where the coffee came from or who had put the coffee on Bob's table, and Cutrer explained that Bob was not restricted from caffeine. Cutrer further testified when she assessed Bob's blisters, which was approximately twelve hours after the incident, there was an empty cup with "some dark dry material" sitting up on Bob's rolling tray. According to Cutrer, she did not know if anybody gave Bob anything that morning or if a family member had left the cup there. Cutrer explained that a family member could have bought the multi-colored cup in the cafeteria, but she had "no idea[]" where it came from.

11

Cutrer explained that the dietary unit provides food and drinks to patients around 6:30 a.m. because breakfast is not served until 8:30 a.m., and they bring coffee in teal, greenish cups to anyone in the rooms. Cutrer testified that the dietary unit does not leave hot coffee if the patient is asleep or nonresponsive. Cutrer also testified that mugs with lids are served to patients at breakfast time, and there are also white cups at the nurse's station. Cutrer testified that if she or any other nurse or staff had brought Bob coffee, they would have stayed with him to make sure he drank it okay or helped him drink it, because Cutrer charted that Bob needed assistance with meals due to being weak and lethargic. According to Cutrer, she had no recollection of Bob ever asking for coffee. Cutrer also testified that Bob had some altered mental status and might have difficulty with mental recollection or know where he was.

Cutrer explained that when she saw Bob on August 8, she did not chart that Bob needed assistance with food because he was eating better. Cutrer testified that on her next encounter with Bob on August 9, she saw blisters on Bob's abdomen. Cutrer testified that Bob told her that he did not ask for any coffee and that when he woke up he did not know the coffee was on his tray, and when he moved his arm the coffee fell on him. Cutrer further testified that Bob reported the wounds on his abdomen did not bother him, and Cutrer explained that the blisters were intact, which keeps infection out. According to Cutrer, on August 10, she told another nurse to

take pictures of Bob's blisters and to let the physician know that he needed to assess the blisters, and when Cutrer returned on August 11, Bob had been discharged. Cutrer testified that a physician ordered Silvadene for Bob.

In his deposition, Bob testified that all he remembers is that coffee fell on him one morning, and that the coffee was in a black plastic cup. Bob testified that he did not know who brought the coffee. Bob explained that his ex-wife was the only person to visit him prior to the coffee spill, and she would not have brought him coffee. According to Bob, he did not ask for coffee, but "he brought the coffee. I was half sleeping." Bob testified although he was asleep, it must have been the aid worker who put the coffee next to his bed because "she's the only one that put – can bring coffee." Bob explained that when he woke up, he grabbed the coffee and it slipped from his hand. Bob testified that after the spill, he thought he pressed the call button, and a black female came and helped him change his clothes and linens. According to Bob, he did not remember if he told anyone else about the coffee spill, but Bob testified that "I'm pretty sure they knew. They probably knew."

Bob further testified that he did not ask for any pain medication, and he did not tell his ex-wife, the physician, or any other nurse about the coffee spill. Bob explained that none of the nurses or the physician looked at his abdomen or applied any cream, and he did not know if anyone took pictures of the burns.

13

Bob's summary-judgment evidence includes Rushing's Expert Report, in which Rushing states that he was asked to determine whether Baptist's care and treatment of Bob met the applicable standards of care and if that care did fall below such standards, whether any injuries resulted from the breach of the standards. Rushing's report indicates that Bob spilled coffee on himself and that it caused blisters. Rushing states that there was a medication order on 8/10/15 for the application of Silvadene to be applied twice daily, but the medication order was never carried out at Baptist. Rushing also reports that there is no indication in the nurses notes that there was any assessment carried out when Bob experienced the coffee spill and burn, and that it appears from the records that the burns were "serendipitously discovered." According to Rushing, there is no documentation in the records that there was any assessment at the time of the occurrence, and no treatment was provided, and Bob's physician was not notified of the incident. Rushing reports that Bob was transferred to HealthSouth on 8/10/15, and while at HealthSouth, photographs were taken showing multiple blisters on Bob's abdomen and left hip, and Bob received Silvadene as treatment. Rushing further reports that nursing records from HealthSouth dated 8/28/15 reflect that Bob's wound from the coffee burns had resolved but resulted in scarring.

Rushing's report states that the standard of care for Baptist and its staff requires that they provide a safe environment and the necessary care, supervision,

and equipment to ensure the hazard/risk for accident or injury to the patients is reduced as far as possible. According to Rushing, Baptist knew or should have known that because of Bob's generalized weakness, Bob was at an increased risk while performing his activities of daily living which would include eating and drinking. Rushing opined that Baptist's and its staff's care and treatment fell below the accepted standard of care by failing to: (1) discover Bob's burns in a timely manner; (2) document Bob's burns appropriately; (3) notify Bob's physician and family of the burns; (4) institute any treatment for the burns; and (5) appropriately supervise Bob's activity of daily living, including serving coffee that would be safely consumed and not at a "scalding" temperature.

In his deposition, Rushing testified that Bob should not have been left with hot coffee because he was weak and needed assistance. According to Rushing, the nurses and doctor should have known the extent of his weakness and taken precautions by assisting and supervising Bob. Rushing testified that he did not know if the nurses had knowledge that someone gave Bob coffee, and Rushing doubted that a coffee service would leave coffee with a sleeping patient who did not request coffee. Rushing agreed that there were several sources the coffee could have come from, he did not know where the coffee came from, and he could not rule out that a visitor may have left the coffee. Rushing also agreed that his criticisms regarding the documentation of the incident and the treatment of the burns did not cause the burns.

15

Rushing testified that the order for the Silvadene was added in handwriting by the discharge doctor on Bob's discharge orders and was intended to be taken to the nursing home, and the Silvadene healed Bob's burns. According to Rushing, Bob's blisters and scarring was not worse due to the Silvadene being ordered on the date of discharge rather than the previous day when the blisters were discovered. Additionally, in his affidavit, Rushing averred that the hospital food service and nursing staff should never place hot coffee above a patient in the same or similar condition as Bob was at the time of the coffee's placement. Rushing further averred that based on reasonable medical probability the hospital employees' negligence was a proximate cause of Bob's coffee spill, burn, and injuries.

Bob's evidence also includes Yeung's Expert Report, in which she opines that the nursing staff at Baptist failed to meet the standard of care by failing to: (1) provide a safe care environment, free from unintended incident, resulting in a significant coffee burn; (2) adequately assess and evaluate Bob's skin condition after the coffee spill; (3) report the incident to Bob's physician, resulting in no medical treatment; (4) recognize the significant of Bob's skin condition and to adequately assess, record, intervene, and report; (5) conduct an investigation of the incident and to put safeguards in place to prevent similar injuries; (6) supervise Bob, who had generalized weakness and needed assistance; and (7) inform Bob and his family about the outcomes of care. Yeung states that the nursing assessment on "8/9/2015

16

8 p.m. to 8/10/2015 8 a.m. (8 p.m. to 8 a.m. shift)" noted that Bob had a blistered area on his abdomen, and that the goals were for the wound to improve, blisters not to burst, and no new skin breakdown. According to Yeung, there was no additional nursing documentation reflecting how or when Bob acquired the blisters. Yeung states that the first observation of Bob's skin condition was the Nursing Shift Assessments on 8/9/2019 at 8:22 p.m., which reveals that blistered areas were noted on the abdomen but did not note the additional burns on his left hip and left flank. Yeung also states that the following shift assessment on 8/10/2015 at 8 a.m. documented that Bob reported spilling coffee on himself the previous day and that pictures were taken and placed on Bob's chart showing multiple bullous present to the abdomen and left hip and skin tears to the left hip. Yeung opined that the nursing staff's failure to meet the standard of care resulted in Bob sustaining injury of skin trauma from coffee burns.

Based on our review of Bob's summary-judgment evidence, Bob did not produce any evidence showing that Baptist's employees and/or staff placed the hot coffee on Bob's bedside table; therefore, Bob presented no evidence that any act or omission on the part of Baptist caused Bob's injury. *See Williams*, 371 S.W.3d at 180. As such, Bob cannot meet his burden to show that any of Baptist's employees and/or staff breached the standard of care by serving Bob hot coffee and placing it on his bedside table. *See Benishi*, 281 S.W.3d at 191. While circumstantial evidence

may be used to establish a material fact, to raise a genuine issue of material fact, evidence must transcend mere suspicion. *Ridgway*, 135 S.W.3d at 601. Here, Bob presented no direct evidence regarding the cause of the spill, and the circumstantial evidence that an employee and/or staff member of Baptist placed the hot coffee on Bob's bedside table does not exceed a scintilla. While Bob's circumstantial evidence establishes that a spill occurred, it only creates a mere suspicion of who placed the coffee on Bob's bedside table, and it does not establish that any employee and/or staff member of Baptist caused the spill or knew that someone had given Bob coffee. *See id.* Accordingly, we overrule issues one and two.

In issue three, Bob argues that his burn injury was worsened by the action or inaction of Baptist and/or its employees. Bob argues that the evidence that Baptist's employees and staff members did not discover the burns until twelve hours after the coffee spill shows that the inaction of Baptist's employees and staff members worsened the burn. Baptist contends that there is no evidence to support Bob's claim that any alleged delay in diagnosis or treatment worsened Bob's initial injury.

The summary-judgment evidence shows that Rushing testified that the discharge physician included an order for Silvadene on Bob's discharge orders, and Bob's burns were treated with Silvadene and healed without infection. Rushing further testified that Bob's blisters and scarring was not worsened by ordering the treatment of Silvadene on the date of discharge rather than the previous day when

the blisters were discovered. Bob testified that he thought Silvadene was used to treat his burns while he was at the hospital, and it took approximately a month for his burns to heal.

Based on our review of Bob's summary-judgment evidence, Bob did not produce any evidence showing that any alleged breach in the standard of care due to a delay in diagnosis or treatment by Baptist's employees and/or staff caused Bob's initial injury to worsen. *See Williams*, 371 S.W.3d at 180; *Benishi*, 281 S.W.3d at 191. Since Bob failed to produce more than a scintilla of evidence demonstrating that any action or inaction by Baptist's employees and/or staff caused Bob's burn injury to worsen, we overrule issue three. *See Chapman*, 118 S.W.3d at 750-51. Having overruled all Bob's issues, we conclude that the trial court did not err in granting summary judgment in Baptist's favor. We affirm the trial court's order granting summary judgment in favor of Baptist.

AFFIRMED.

_____
W. SCOTT GOLEMON
Chief Justice

Submitted on August 10, 2021
Opinion Delivered November 24, 2021

Before Golemon, C.J., Kreger and Horton, JJ.